IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: YOSEMITE NATIONAL PARK HANTAVIRUS LITIGATION<br><br>_____<br><br>THIS DOCUMENT RELATES TO:<br><br>CHRISTOPHER J. HARRISON, et al.,<br>    Plaintiffs<br>v.<br>DNC PARKS & RESORTS AT YOSEMITE, INC., et al.<br>    Defendants | Case No. 14-md-02532-MMC<br><br>Individual Case No. 14-cv-0451 MMC<br><br>**ORDER DENYING IN PART AND DEFERRING RULING IN PART ON DNC DEFENDANTS' MOTIONS TO EXCLUDE OPINION TESTIMONY** |

Before the Court are two motions filed November 24, 2017, by Delaware North Companies Inc., Delaware North Companies Parks & Resorts, Inc., and Delaware North DNC Parks & Resorts at Yosemite, Inc. (collectively, "DNC Defendants"): (1) "Motion to Exclude The Opinion Testimony of Plaintiffs' Expert, Branko Huisa-Garate M.D." ("Dr. Huisa Mot."); and (2) "Motion to Exclude the Opinion Testimony of Matthew Arnold, M.D., Michael Geschwind, M.D., Karen Johnson, M.D., Nina Riggins, M.D., Grant Wang, M.D., and Scott Weisenberg, M.D." ("Treating Physicians Mot."). The motions have been fully briefed. The matters came on regularly for hearing on January 26, 2018. Patrick S. Schoenburg of Wood Smith Henning & Berman LLP and Kevin J. English of Phillips Lytle LLP appeared on behalf of the DNC Defendants. James P. Collins of The Boccardo Law Firm, Inc. appeared on behalf of plaintiffs Christopher J. Harrison and Felicia I. Tornabene.

Having read and considered the papers filed in support of and in opposition to the motions, and having considered the parties' respective oral arguments, the Court rules as follows.

**DISCUSSION**

Plaintiffs allege that, in June 2012, they stayed in a "Signature Tent Cabin," located in Yosemite National Park, and that plaintiff Christopher J. Harrison ("Harrison") subsequently contracted hantavirus. (See Amended Master Consolidated Complaint ¶¶ 81, 149.) According to plaintiffs, as a result of Harrison's having contracted hantavirus, he has, inter alia, suffered and continues to suffer from neurological impairments, specifically, as identified at the hearing, the following: migraines, photophobia, and short-term memory loss. Based thereon, plaintiffs bring several state law causes of action, specifically, negligence, loss of consortium, and fraud.

Under California law, plaintiffs must prove causation "within a reasonable medical probability based upon competent expert testimony." See Avila v. Willits Environmental Remediation Trust, 633 F.3d 828, 836 (9th Cir. 2011) (internal quotation and citation omitted). Plaintiffs also must establish that the virus at issue is "capable of causing the injury alleged (general causation)" and that such virus "caused, or was a substantial factor in causing [Harrison's] injury (specific causation)." See id. In that regard, plaintiffs have disclosed a retained expert, Branko Huisa-Garate, M.D. ("Dr. Huisa"), who has opined that "hantavirus is capable of compromising the CNS [central nervous system]" (see Collins Decl. Doc. 266 Ex. 5 at 5), and that Harrison's neurological impairments are the result of his having contracted Hantavirus (see id.); in addition, plaintiffs have disclosed four physicians who treated Harrison, specifically, Michael Geschwind, M.D. ("Dr. Geschwind"), Karen Johnson, M.D. ("Dr. Johnson"), Nina Riggins, M.D. ("Dr. Wiggins"), and Scott Weisenberg, M.D. ("Dr. Weisenberg"), each of whom has opined that Harrison's neurological impairments are the result of his having contracted

//
//

2

hantavirus (see Collins Decl. Decl. Doc. 267 Ex. 13 at 10-16, 19-21).[1]

By the instant motions, DNC Defendants contend the above-described opinions should be excluded under Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), on the ground that plaintiffs have failed to establish either such opinion is based on a scientifically reliable methodology. See id. at 589 (holding district judge must ensure that "any and all scientific testimony or evidence admitted" is "reliable"). DNC Defendants ask the Court to exclude the experts' testimony "on the papers or hold a Daubert hearing." (See DNC Defs.' Dr. Huisa Mot. at 18:6-7; DNC Defs.' Treating Physicians Mot. at 22:2-3.)

**A. General Causation**

As noted, plaintiffs' retained expert, Dr. Huisa, has opined that hantavirus can cause neurological impairments. Dr. Huisa is a board-certified neurologist who presently is a clinician and assistant professor in the neurosciences department at the University of California, San Diego (see Collins Decl. Doc. 266 Ex. 5 at 1, Ex. 10 at 1-2), and who previously was a clinician and assistant professor in the neurology department at the University of New Mexico (see id. Ex. 5 at 1, Ex. 10 at 1).

DNC Defendants argue that plaintiffs cannot show Dr. Huisa's opinion is "scientifically reliable," because, according to DNC Defendants, "[t]here are no peer reviewed scientific or medical studies" and no "scientific or medical literature" finding that hantavirus can cause neurological injuries. (See DNC Defs.' Dr. Huisa Mot. at 2:6-13.)

"One means of showing [an expert opinion is reliable] is by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1318 (9th Cir. 1995). An expert opinion may,

---

[1] To the extent the second of the two motions seeks to preclude treating physicians Matthew Arnold, M.D. ("Dr. Arnold") and Grant Wang, M.D. ("Dr. Wang"), from offering such opinions, the motion will be denied as moot, as plaintiffs, in their opposition, have clarified that neither of those physicians will offer an opinion as to causation.

1  however, "still be reliable and admissible without peer review and publication." <u>Wendell</u>
2  <u>v. GlaxoSmithKline, LLC</u>, 858 F.3d 1227, 1235 (9th Cir. 2017). "This is especially true
3  when dealing with rare diseases that do not impel published studies." <u>See id.</u>; <u>Daubert</u>,
4  509 U.S. at 593 (noting "some propositions . . . are too particular, too new, or of limited
5  interest to be published"; declining to "set out a definitive checklist"); <u>see</u>, <u>e.g.</u>, <u>Wendell</u>,
6  858 F.3d at 1236-37 (finding admissible, despite absence of published study, expert
7  opinion that prescription drug caused rare cancer; noting experts' reliance on "case
8  studies," their "own wealth of experience," and "literature").

Hantavirus rarely infects humans. (<u>See</u> English Decl. Doc. 272 Ex. 3) (stating, "[c]ompared to other vector-borne pathogens, such as Lyme disease and West Nile virus, the risk of contracting hantavirus is almost negligible").) Hantavirus was first recognized in the United States in 1993 (<u>see</u> Collins Decl. Doc. 266 Ex. 3, Ex. 23 at 1), and, as of that date, an average of only twenty-nine to thirty cases have been reported each year (<u>see id.</u> Ex. 3; English Decl. Doc. 272 Ex. 1 at 3). Given the rarity of hantavirus infections, the lack of peer reviewed studies or other publications finding a causal connection between hantavirus and neurological impairments is neither surprising nor, provided other indicia of reliability can be shown, a bar to admission. <u>See</u> <u>Daubert</u>, 509 U.S. at 593 (holding "publication . . . does not necessarily correlate with reliability").

Here, plaintiffs have offered evidence, undisputed by defendants, that viruses can cause neurological impairments. (<u>See</u>, <u>e.g.</u>, Collins Decl. Doc 267 Ex. 6 at 79:13-20, 118:19 - 119:6, 128:9-22; <u>id.</u> Ex. 12; Collins Decl. Doc. 275 Ex. 11 at 41:5-19, 45:2-21.) With respect to hantavirus, Dr. Huisa relies on several case studies of patients who developed neurological impairments following infection by hantavirus (<u>see</u> Collins Decl. Doc 266 Exs. 5-6; <u>id.</u> Exs. 4, 11, 23, 24), as well as on a "longitudinal, prospective study" of hantavirus survivors that reported 55% of the survivors had "short-term memory difficulties" (<u>see id.</u> Exs. 6, 20), and his experience as a board-certified neurologist, in particular, his work at the University of New Mexico "consult[ing] on patients having

//

hantavirus infections" (see id. Ex. 5 at 3).[2] In challenging the sufficiency of plaintiffs' showing, DNC Defendants have not identified any evidence showing hantavirus cannot cause neurological impairments, and, indeed, at least one defense expert has "agree[d] with Dr. Huisa's determination that inflammation of the brain is possible secondary to a hantavirus exposure," albeit only in "very rare cases." (See Collins Decl. Doc. 266 Ex. 22 at 135:18-23.) Under such circumstances, the Court finds plaintiffs have sufficiently demonstrated Dr. Huisa's general causation opinion is "not the type of 'junk science' Rule 702 was meant to exclude." See Wendell, 858 F.3d at 1237.

Accordingly, to the extent DNC Defendants seek, on the papers submitted, an order excluding Dr. Huisa's opinion as to general causation, the motion will be denied.

The Court next considers DNC Defendants' alternative request that the Court conduct a Daubert hearing before the jury is allowed to hear Dr. Huisa's testimony. An evidentiary hearing under Daubert is not required where the parties' "briefing on [the expert's] scientific expertise and proposed testimony" provides an "adequate record from which the court could make its ruling" as to admissibility. See Millenkamp v. Davisco Foods Int'l, Inc., 562 F.3d 971, 979 (9th Cir. 2009). Here, the Court finds the record presented to date is adequate, and DNC Defendants have not identified in their papers or at the hearing any additional information that could be offered to show Dr. Huisa's general causation opinion is unreliable.

Accordingly, to the extent DNC Defendants request a Daubert hearing in advance of Dr. Huisa's testimony, the motion will be denied, without prejudice to the matter being raised at a later stage upon a showing that Dr. Huisa's testimony is unreliable.[3]

---

[2] New Mexico has reported the "highest number of cases" of hantavirus infections in the United States (see id.), and the University of New Mexico has treated more hantavirus patients than any other hospital in North America (see English Decl. Doc. 254 Ex. 3 at 1).

[3] As the Court noted at the hearing, if Dr. Huisa or any other expert does testify at trial, and plaintiffs, upon proper objection, are unable to establish the reliability of the opinion offered, such expert's testimony would be stricken and the jury instructed to disregard it.

## B. Specific Causation

With respect to the issue of specific causation, plaintiffs, as set forth above, have disclosed, along with retained expert Dr. Huisa, four treating physicians, namely, Drs. Geschwind, Johnson, Riggins, and Weisenberg, each of whom has offered the opinion that Harrison's neurological impairments are the result of his having contracted hantavirus. Dr. Geschwind is a Professor of Neurology at the University of California, San Francisco, Memory and Aging Center, where he also is an attending physician. (See Collins Decl. Doc. 267 Ex. 4.) Dr. Johnson, a board-certified psychiatrist who presently maintains a private practice, is an Assistant Clinical Professor of Psychiatry at the University of California, San Francisco, and previously was a Senior Scholar and Clinic Scholar at Stanford University. (See id. Ex. 15.) Dr. Riggins, a board-certified neurologist, is an Assistant Clinical Professor and the Director of Headache Inpatient Service at the University of California, San Francisco. (See id. Ex. 9.) Dr. Weisenberg is an internist affiliated with Alta Bates Summit Medical Center who is board-certified in internal medicine and infectious diseases, and whose practice is "100 percent infectious disease." (See id. Ex. 8 at 9:24 - 10:21, Ex. 11.)

DNC Defendants contend the above five doctors' specific causation opinions should be excluded on the ground that the opinions are not the result of a reliable method, because, defendants argue, the opinions are based solely on temporal proximity and that no differential diagnosis was performed. In opposition, plaintiffs assert there is ample evidence in the record to support a finding that the challenged opinions are based on differential diagnoses.

For purposes of a Daubert analysis, an opinion based on a diagnosis is deemed reliable where the expert "compiles a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration" and "provides reasons for rejecting alternative hypotheses using scientific methods and procedures." See Clausen v. M/V New Carissa, 339 F.3d 1049, 1057-58 (9th Cir. 2003).

//

Here, the evidence submitted includes numerous medical records setting forth other possible causes for Harrison's neurological impairments and subsequent rejection thereof. (See, e.g., Collins Decl. Doc 266 Ex. 7 at 2 (entry in medical record by Mac L. Sterling, M.D., treating physician at Alta Bates, finding there is "absolutely no evidence of viral meningitis"; noting Harrison did not have "stiff neck" and "spinal fluid is normal"); Collins Decl. Doc. 275 Ex. 2 at CH001175 (notation in medical record by Nikki L. Martin, M.D., treating physician at Alta Bates, "rul[ing] out West Nile virus" based on "diagnostic impression"); Collins Decl. Doc. 266 Ex. 31 at 14-16 ("Neurological Report" by Dawn A. Osterweil, Ph.D., summarizing Harrison's medical records, including: Alta Bates physician's notation, upon review of CT scan, re: "no acute intracranial process"; entry by Contra Costa Medical Center noting, based on review of ultrasound, "no evidence of DVT [deep vein thrombosis] in upper arm"; Dr. Weisenberg's findings, based on results of lab tests, no "HTVL I/II antibody," "B Henselae IgG IgM," "toxoplasma," "B Microtti Ab" or "coccidioides Ab CF"; and Dr. Arnold's finding "minimal anemia" and "normal" B12 and metabolic panel); English Decl. Doc. 272 Ex. 9 at 4 (defense expert acknowledging Dr. Osterweil's consideration and exclusion of "malingering" and "suspect effort"); English Decl. Doc 254 Ex. 9 (Geschwind Dep.) at 90:14-24 (testifying to initial consideration and subsequent elimination of "post encephalitis" as cause, given Harrison's "spinal fluid did not show any active inflammation"); English Decl. Doc 255 Ex. 5 at 7 (defense expert acknowledging treating physician James Hirshberg, M.D.'s "consultation note" that "Harrison's clinical picture was not consistent with meningitis or encephalitis"; also acknowledging consulting physician David Perlman, MD.'s finding that "Harrison did not have any evidence of meningitis or encephalitis"); English Decl. Doc. 254 Ex. 8 (Arnold Dep.) at 18:10 - 20:3 (testifying Harrison's records included "pretty big work-up for cause of headache that had been relatively negative" and that "a lot of things had been ruled out" by other physicians); id. Ex. 11 (Weisenberg Dep.) at 85:18 - 86:2, 94:4-6 (testifying to "negative results" for other "plausible infections and etiologies"; noting "imaging and prior analyses in the hospital would make inflammation of the spinal fluid less likely" as

1 cause); Collins Decl. Doc. 267 Ex. 8 (Weisenberg Dep.) at 61:16 - 63:4 (testifying Harrison did not have "typical symptoms of severe sinusitis, such as high fevers or severe facial pain," and eliminating chronic sinus infection as cause, given symptoms remained after course of antibiotics); id. Ex. 8 at 71:17 - 72:15 (testifying Harrison's symptoms were not "consistent with a psychiatric cause"); English Decl. Doc. 254 Ex. 7 (Wang Dep.) at 98:3-22 (noting lack of symptoms consistent with "general anxiety," e.g., "gastrointestinal pain in the back, chest pains [and] shortness of breath"; ruling out "other neurological conditions" as cause in light of "radiology['s]" analysis of "brain scans").)

The Court next considers whether plaintiffs have made a sufficient showing that the above-listed five experts base their respective diagnoses on a reliable method, namely, differential diagnosis. See Clausen, 339 F.3d at 1057-58.

With respect to Dr. Huisa, his report indicates that, in forming his specific causation opinion, he considered Harrison's medical records, as well as the deposition testimony offered by four of Harrison's treating physicians (see Collins Decl. Doc. 266 Ex. 5 at 4; see also English Decl. Doc. 272 Ex. 3 at 12:7-10, 18-21), and, at his deposition, he testified he made a differential diagnosis (see Collins Decl. Doc. 266 Ex. 12 at 125:21-23). In that regard, he testified he reviewed Harrison's medical records to determine what other causes Harrison's treating physicians had considered and ruled out (see id. Ex. 12 at 175:15-19). As examples, he testified that he considered and ruled out "malingering" (see id. Ex. 12 at 175:19-25), which cause, as noted above, was considered and ruled out by Dr. Osterweil, whose report Dr. Huisa considered (see id. Ex. 5 at 4), and that he considered and ruled out a preexisting "psychiatric condition," based on his review of Dr. Johnson's records and the "emergency room" records (see English Decl. Doc. 272 Ex. 3 at 108:14-28; Collins Decl. Doc. 266 Ex. 12 at 109:1-24). Under such circumstances, the Court finds plaintiffs have sufficiently shown Dr. Huisa's specific causation opinion is based on a reliable method.[4]

---

[4] To the extent DNC Defendants may be contending that a physician cannot offer a specific causation opinion unless that physician has himself or herself ruled out each of

8

1   Accordingly, to the extent DNC Defendants seek to exclude Dr. Huisa's specific
2   causation opinion, the motion will be denied, without prejudice to the matter being raised
3   at a later stage upon a showing that Dr. Huisa's testimony is unreliable.

4   As to the four other physicians disclosed as experts by plaintiffs, the Court first
5   notes that treating physicians are not required to prepare written expert reports. See
6   Fed. R. Civ. P. 26(b)(2)(B). The only source of information the Court has at this time as
7   to the bases for the treating physicians' specific causation opinions is contained in the
8   parties' respective, selected excerpts from deposition testimony, none of which reflects
9   whether the witness was provided an opportunity to set forth the full extent of the
10  witness's reasoning.

11  With respect to Dr. Weisenberg, when, at his deposition, he was asked if his
12  specific causation opinion was "based on the assumption that there's nothing else in
13  [Harrison's] reports to [him] that could indicate what . . . caused" Harrison's current
14  symptoms, he answered that his opinion was based on Harrison's "positive result for
15  hantavirus and negative results for other plausible infectio[n]s and etiologies for his
16  original syndrome." (See Collins Decl. Doc. 267 Ex. 8 at 85:18 - 86:2.) Although Dr.
17  Weisenberg apparently was not asked to identify the "other plausible" causes he
18  considered and ruled out, he did provide some examples, specifically, and as noted
19  above, that, "imaging and prior analyses in the hospital would make inflammation of the
20  spinal fluid less likely" (see English Decl. Doc. 254 Ex. 11 94:4-6), that he ruled out
21  chronic sinus infection, given Harrison's symptoms remained after a course of antibiotics
22  (see Collins Decl. Doc. 267 Ex. 8 at 61:16 - 63:4), and that he ruled out a "psychiatric
23  cause," given Harrisons' symptoms were not consistent therewith (see id. Ex. 8 at 71:17 -
24  72:15).[5] Under such circumstances, the Court finds plaintiffs have sufficiently shown Dr.

---

the other possible causes, the Court is unpersuaded. Indeed, it stands to reason that a physician would rely on the findings of other physicians, particularly where those other physicians specialize in areas different from that in which such physician practices.

[5]Additionally, as further noted above, Harrison's medical records include findings by Dr. Weisenberg that, based on results of lab tests, Harrison had no "HTVL I/II

Weisenberg's specific causation opinion is based on a reliable method.

Accordingly, to the extent DNC Defendants seek to exclude Dr. Weisenberg's specific causation opinion, the motion will be denied, without prejudice to the matter being raised at a later stage upon a showing that Dr. Weisenberg's testimony is unreliable.

Next, Dr. Geschwind, at his deposition, testified that when he began to treat Harrison, he followed his usual practice of "review[ing] the outside records," such as "laboratory tests including imaging, blood, urine, spinal fluid, [and] whatever might be available," then "tak[ing] [from the patient] an extensive history of the current symptoms and problems," next "investigat[ing] the patient's "social history" and "family history," also "do[ing] a brief general exam [and] a more detailed neurological exam," and, lastly, "try[ing] to take all that information and come up with an assessment of what is going on." (See Collins Decl. Doc. 267 Ex. 6 at 21:9-23; Ex. 7 at 1.) Although Dr. Geschwind apparently was not asked at his deposition to identify each possible cause he considered and rejected, he did provide some examples, specifically, that, based on the results of a blood test he ordered, he considered and ruled out "systematic inflammation" (see Collins Decl. Doc. 275 Ex. 11 at 44:3-13), as well as "post encephalitis" because Harrison's "spinal fluid did not show any active inflammation" (see English Decl. Doc 254 Ex. 9 at 90:14-24.) Under such circumstances, the Court finds plaintiffs have sufficiently shown Dr. Geschwind's specific causation opinion is based on a reliable method.

Accordingly, to the extent DNC Defendants seek to exclude Dr. Geschwind's specific causation opinion, the motion will be denied, without prejudice to the matter being raised at a later stage upon a showing that Dr. Geschwind's testimony is unreliable.

Dr. Johnson, however, when asked at her deposition if her "diagnosis of a

---

antibody," "B Henselae IgG IgM," "toxoplasma," "B Microtti Ab" or "coccidioides Ab CF." (See Collins Decl. Doc. 266 at 15.) Dr. Weisenberg was not, at least in the excerpts from his deposition provided to the Court, asked about those results and what causes he ruled out based thereon.

10

1 connection between hantavirus and . . . Harrison's symptoms is primarily based on the
2 temporal relationship," answered "yes." (See id. Ex. 6 at 65:1-4.) She apparently was
3 not asked to identify any other bases for her specific causation opinion and, unlike Dr.
4 Weisenberg and Dr. Geschwind, she did not testify that she reviewed Harrison's medical
5 records to determine what possible causes his other treating physicians had considered
6 and ruled out. Given the paucity of information provided to the Court, the Court is unable
7 to determine whether Dr. Johnson engaged in a differential diagnosis of any type. As the
8 present record does not appear to preclude a finding that Dr. Johnson made a differential
9 diagnosis, however, the Court, as set forth below, will afford plaintiffs leave to file a
10 detailed offer of proof as to the bases for her specific causation opinion.

Accordingly, to the extent the motion seeks an order excluding Dr. Johnson's specific causation opinion, the Court will defer ruling.

Lastly, although Dr. Riggins testified at her deposition that she did a "complete review" of Harrison's medical records (see Collins Decl. Doc. 275 at 21:11-20), she also testified that "timeline-wise, it makes sense that [a] person had exposure, which was documented from blood work, and reports intense headache after that" (see Collins Decl. Doc. 267 Ex. 10 at 29:13-16). Given the above testimony, an inference can be drawn that temporal proximity is a factor supporting Dr. Riggins' opinion. Whether her opinion is based on anything more than temporal proximity, however, does not appear to have been addressed at her deposition. As the present record does not preclude a finding that Dr. Riggins made a differential diagnosis, the Court, as set forth below, will afford plaintiffs leave to file a detailed offer of proof as to the bases for her specific causation opinion.

Accordingly, to the extent the motion seeks to exclude Dr. Riggins' specific causation opinion, the Court will defer ruling.

//
//
//
//

11

**CONCLUSION**

For the reasons stated above:

1. DNC Defendants' motion to exclude the causation opinion testimony of Dr. Huisa is hereby DENIED.

2. DNC Defendants' motion to exclude the causation opinion testimony of Drs. Arnold, Geschwind, Johnson, Riggins, Wang, and Weisenberg is hereby DENIED in part and DEFERRED in part, as follows:

    a. To the extent the motion seeks to exclude the causation opinion testimony of Dr. Arnold and Dr. Wang, the motion is DENIED as moot.

    b. To the extent the motion seeks to exclude the causation opinion testimony of Dr. Weisenberg and Dr. Geschwind, the motion is DENIED.

    c. To the extent the motion seeks to exclude the causation opinion testimony of Dr. Johnson and Dr. Riggins, the Court DEFERS ruling thereon, and plaintiffs, if they intend to call those physicians to offer causation opinion testimony at trial, shall file, no later than March 6, 2018, a detailed offer of proof as to the bases for their respective opinions, which submissions will be addressed at the Pretrial Conference.

**IT IS SO ORDERED.**

Dated: February 23, 2018

MAXINE M. CHESNEY
United States District Judge