IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: YOSEMITE NATIONAL PARK HANTAVIRUS LITIGATION<br><br>_____<br><br>THIS DOCUMENT RELATES TO:<br><br>CHRISTOPHER J. HARRISON, et al.,<br>    Plaintiffs<br>v.<br>DNC PARKS & RESORTS AT YOSEMITE, INC., et al.<br>    Defendants | Case No. 14-md-02532-MMC<br><br>Individual Case No. 14-cv-0451 MMC<br><br>**ORDER GRANTING DEFERRED PORTION OF DNC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

By order filed January 31, 2018, the Court granted in part, denied in part, and deferred ruling in part on the motion for summary judgment filed November 24, 2017, by defendants Delaware North Companies Inc. ("DNC"), Delaware North Companies Parks & Resorts, Inc. ("DNC-Parks"), and Delaware North DNC Parks & Resorts at Yosemite, Inc.'s ("DNC-Yosemite") (collectively, "DNC Defendants"). Specifically, the Court deferring ruling on the issue of alter ego liability "pending receipt of the parties' report advising the Court whether it remains necessary to address that issue." (See Order, filed January 31, 2018, at 3:1-3.) Subsequent thereto, on February 9, 2018, DNC Defendants and plaintiffs Christopher J. Harrison and Felicia I. Tornabee, the remaining plaintiffs in the above-titled multidistrict litigation, advised the Court of the need for a ruling on the deferred issue. Accordingly, as to the remaining issue presented in the DNC Defendants' motion for summary judgment, the Court hereby rules as follows.

In the operative complaint, the Amended Master Consolidated Complaint ("AMCC"), plaintiffs assert several state law causes of action, specifically, negligence, loss of consortium, and fraud, which claims are based on plaintiffs' allegation that, in June 2012, plaintiffs stayed in a "Signature Tent Cabin," located in Yosemite National Park, and that plaintiff Christopher J. Harrison subsequently contracted hantavirus. (See AMCC ¶¶ 81, 149.) Plaintiffs allege that DNC-Yosemite is the "concessionaire of the Signature Tent [C]abins" and is "a wholly owned subsidiary and under the control of [DNC] and [DNC-Parks]" (see AMCC ¶ 4), and that the DNC Defendants are "alter egos of each other" (see AMCC ¶ 6).

DNC Defendants argue plaintiffs lack evidence to establish that either DNC or DNC-Parks is the alter ego of DNC-Yosemite.

"It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." United States v. Bestfoods, 524 U.S. 51, 61 (1998) (internal quotation and citation omitted). Under California law, to establish an "alter ego exception" to the above-stated general principle, a plaintiff must show: (1) "there is such unity of interest and ownership that the separate personalities of the two entities no longer exist"; and (2) "failure to disregard their separate identities would result in fraud or injustice." See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd., 328 F.3d 1122, 1134 (9th Cir. 2003 (internal quotation, citation and alterations omitted). A plaintiff seeking to establish alter ego liability has the burden to establish both of the above-referenced "essential elements." See Sonora Diamond Corp. v. Superior Court, 83 Cal. App. 4th 523, 539 (2000).

With respect to the second element,[1] a plaintiff must establish that "some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the

---

[1] Although both parties discuss at considerable length the first of the two elements, the Court, given its finding as to the second element, does not further address herein the first element.

2

1  corporate form." See id.; see also Associated Vendors, Inc. v. Oakland Meat Co., 210
2  Cal. App. 2d 825, 838 (1962) (noting "bad faith in one form or another is an underlying
3  consideration . . . in those cases wherein the trial court was justified in disregarding the
4  corporate entity") (citing cases). "Difficulty in enforcing a judgment or collecting a debt,"
5  however, "does not satisfy this standard." See Sonora Diamond Corp., 83 Cal. App. 4th
6  at 539; Associated Vendors, 210 Cal. App. 2d at 842 (holding "it is not sufficient to merely
7  show that a creditor will remain unsatisfied if the corporate veil is not pierced, and thus
8  set up such an unhappy circumstance as proof of an 'inequitable result'").

Here, DNC Defendants have offered evidence, uncontradicted by plaintiffs, that DNC-Yosemite has insurance available to pay any compensatory award plaintiffs may obtain. (See English Decl. Ex. 9 at 11-12.) As DNC-Yosemite's insurance will not cover any punitive damage award plaintiffs may obtain, however, the issue presented is whether difficulties plaintiffs may encounter in collecting a punitive damage award from DNC-Yosemite can be attributed to some type of conduct on the part of DNC or DNC-Parks that amounts to bad faith. On that issue, the parties disagree as to whether the manner in which DNC manages DNC-Yosemite's cash involves bad faith conduct.

In that regard, there is no dispute as to the following: (1) DNC-Yosemite is a wholly owned subsidiary of DNC-Parks and DNC-Parks is a wholly owned subsidiary of DNC (see English Decl. Ex. 53 ¶ 3, Ex. 1 ¶ 3); (2) DNC "regularly" performs a "cash sweep" of DNC-Parks and DNC-Yosemite's accounts (see id. Ex. 2 (Feeney Dep.) at 24:17-25:2; 99:1-3), which DNC does for reasons of "economic efficiency" on behalf of all of the "Delaware North company family" (see id. Ex. 2 at 25:3-8); (3) to effectuate the sweep, the subsidiaries, on each day, "identify what their cash needs are," for example, funds needed "to pay payroll" or "to pay for cap ex [capital expenditure] projects," and funds in "excess" of what the subsidiaries need are "swept" into a J.P. Morgan Chase "cash sweep account" in DNC's name (see id. Ex. 2 at 24:23 - 25:2, 99:17-19, 100:15-22); (4) if the subsidiary reports to DNC that it has no excess funds on a particular day, which has occurred "many times," no cash is swept from the subsidiary on that date (see

3

id. Ex. 2 at 100:6-11); (5) DNC "trace[s]" the excess funds that are swept from each subsidiary and each subsidiary earns interest on the amount of its funds placed in the cash sweep account, which interest is "returned" to that subsidiary," (see English Decl. Ex. 2 at 101:12 - 102:6); (6) when DNC-Yosemite "needs money" held in the cash sweep account, such funds are "swept back down" by DNC (see Bashant Decl. (Barney Dep.) Ex. 23 at 185:20 - 186:3); and (7) DNC has "never not funded the subsidiary" (see id. Ex. 23 at 186:4-7).

As DNC Defendants point out, "[i]t has been widely recognized in the corporate world that there is nothing inherently wrong in a parent managing all the cash generated by the subsidiaries through a cash management system," see Hillsborough Holdings Corp. v. Celotex Corp. (In re Hillsborough Holdings Corp.), 166 B.R. 461, 471 (Bankr. M.D. Fla. 1994) (citing cases), and that a "cash management system [is] indicative of the usual parent-subsidiary relationship," see Fletcher v. Atex, Inc., 68 F.3d 1451, 1459 (2nd Cir. 1995). Plaintiffs have provided no authority to the contrary, nor have plaintiffs identified any particular aspect of the above-described management system that would suggest any of the DNC Defendants is or was acting in bad faith.

In sum, plaintiffs have not met their burden of showing DNC-Yosemite is the alter ego of either DNC or DNC-Parks.

Accordingly, DNC Defendants are entitled to summary judgment on the issue of alter ego liability.

**CONCLUSION**

For the reasons stated, to the extent DNC Defendants' motion seeks summary judgment on the issue on the alter ego liability of DNC and/or DNC-Parks, the motion is hereby GRANTED.

**IT IS SO ORDERED.**

Dated: March 1, 2018

MAXINE M. CHESNEY
United States District Judge